DCP/HDM/JKW
F. #2020R00324

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

RAYTHEON COMPANY,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. <u>24-CR-399 (RER)</u>
(T. 18, U.S.C., §§ 371, 981(a)(1)(C) and
3551 <u>et seq.</u>; T. 21, U.S.C., § 853(p); T.
28, U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

        At all times relevant to this Information, unless otherwise stated:

I.     <u>Relevant Statutory Background</u>

        1.     The Foreign Corrupt Practices Act ("FCPA") was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to corruptly offer, promise, authorize or pay money or anything of value, directly or indirectly, to a foreign government official to secure an improper advantage for the purpose of obtaining or retaining business for, or directing business to, any person.

        2.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President to control, among other things, the export of defense articles and defense services deemed critical to the national security and foreign policy interests of the United States. By Executive Order 13637, the President delegated this authority to the United States Department of State, which was further delegated to the Department of State's Directorate of Defense Trade Controls ("DDTC"). Pursuant to its authority under the AECA, DDTC promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, which contained the

1


COURT'S
EXHIBIT NO. 2
IDENTIFICATION/EVIDENCE
DKT.# 24 CR 399
DATE: 10 16 24

United States Munitions List ("USML"). As set forth in the ITAR, DDTC reviewed and granted or denied export licenses for the transfer or retransfer of defense articles and defense services identified on the USML.

3. Pursuant to the AECA, 22 U.S.C. § 2779, and the ITAR, 22 C.F.R. § 130.9, certain Applicants (as defined in 22 C.F.R. § 130.2) applying for export licenses were required to inform DDTC whether the Applicant or its Vendors (as defined in 22 C.F.R. § 130.8) had paid, offered or agreed to pay political contributions, fees or commissions in connection with the sale or transfer of a defense article or defense service. The purpose of this provision was to provide Executive Branch oversight of the sale of U.S. military technology and prevent "improper influence" in those sales. H.R. REP. 94-1144, 58, 1976 U.S.C.C.A.N. 1378, 1434. Under these provisions, for defense articles or defense services valued in an amount of $500,000 or more that are sold commercially to or for the use of the Armed Forces of a foreign country or international organization (as defined in 22 C.F.R. § 130.3), an Applicant must report to DDTC any payments or agreements to pay (i) political contributions of $5,000 or more, and (ii) fees or commissions of $100,000 or more. 22 C.F.R. §§ 130.1, 2, 9.

4. Further, under 22 C.F.R. § 130.11, all Applicants and their Vendors had an ongoing obligation to correct any false statements or omissions on previous export license applications, including false statements or omissions covered by Part 130. If a prior Part 130 statement or report was inaccurate or incomplete, the applicant had to file a supplementary report to ensure that DDTC had complete and accurate information. *Id.*

II.    Relevant Entities and Individuals

    A.    The Defendant and Other Relevant Entities and Individuals

    5.    The defendant RAYTHEON COMPANY ("RAYTHEON" or the "Company") was a global aerospace and defense company headquartered in Waltham, Massachusetts. RAYTHEON's shares were publicly traded on the New York Stock Exchange, and the Company was therefore an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1.

    6.    In 2001, RAYTHEON formed a joint venture with a French defense company ("JV"). The JV had two major operating subsidiaries, one of which was based in Fullerton, California, controlled by RAYTHEON and a component of RAYTHEON's Network Centric Systems and then Integrated Defense Systems business (hereinafter, together with the operating subsidiary, "IDS"). RAYTHEON did business in Qatar, including through IDS.

    7.    Raytheon Employee 1, an individual whose identity is known to the United States and RAYTHEON, was a United States citizen and a director at IDS. Raytheon Employee 1 was an "employee" and "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

    8.    Raytheon Employee 2, an individual whose identity is known to the United States and RAYTHEON, was a United States citizen and a program manager at IDS. Raytheon Employee 2 was an "employee" and "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

    9.    Raytheon Employee 3, an individual whose identity is known to the United States and RAYTHEON, was a United States citizen and a program manager at IDS. Raytheon

Employee 3 was an "employee" and "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

10. Raytheon Employee 4, an individual whose identity is known to the United States and RAYTHEON, was a United States citizen and a technical director at IDS. Raytheon Employee 4 was an "employee" and "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11. Raytheon Employee 5, an individual whose identity is known to the United States and RAYTHEON, was a United States citizen and a business development executive at IDS. Raytheon Employee 5 was an "employee" and "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12. Local Company, an entity the identity of which is known to the United States and RAYTHEON, was a construction company that built villas in Qatar and was associated with Foreign Official 1 (defined below).

13. Qatari Company, an entity the identity of which is known to the United States and RAYTHEON, was a consulting and information technology services company established in Qatar in or around May 2012. Qatari Company had two wholly-owned subsidiaries also established in Qatar: Qatari Sub 1, an entity known to the United States and RAYTHEON, was a defense and security consultancy firm formed in or around July 2012, and Qatari Sub 2, an entity known to the United States and RAYTHEON, was a cybersecurity company formed in or around January 2014. Qatari Company, Qatari Sub 1 and Qatari Sub 2 (together, the "Qatari Entities") were used to receive, conceal and distribute bribe payments from and on behalf of RAYTHEON for the benefit of Foreign Official 1 (defined below).

4

14. Individual 1, an individual whose identity is known to the United States and RAYTHEON, was a citizen of the United States and other countries and an officer and shareholder of the Qatari Entities.

B. State-Owned Entities and Government Officials

15. The Qatar Emiri Air Force ("QEAF") was a military branch of Qatar's Armed Forces ("QAF") that was primarily responsible for the conduct of air warfare. The QEAF and QAF were each a "department" and "agency" of a foreign government as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

16. The Cooperation Council for the Arab States of the Gulf, also known as the Gulf Cooperation Council ("GCC"), was an intergovernmental union of six member states: Bahrain, Kuwait, Oman, Qatar, Saudi Arabia and the United Arab Emirates.

17. Foreign Official 1, an individual whose identity is known to the United States and RAYTHEON, was a citizen of Qatar who served as a high-level official at the QEAF from at least approximately 2009 through approximately June 2016. Foreign Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A). Foreign Official 1 was a founder, board member and a beneficial owner of the Qatari Entities.

III. The Bribery Scheme

A. Overview

18. Between in or around 2012 and in or around 2016, RAYTHEON, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to corruptly offer and pay bribes to, and for the benefit of, Foreign Official 1 to secure improper advantages in order to assist RAYTHEON in obtaining and retaining business from the QEAF and

5

QAF, including (1) four supplemental additions to a 1998 contract between RAYTHEON and the GCC, and (2) a sole-source contract to build a joint operations center ("JOC") that would interface with Qatar's several military branches.

### i. The GCC Contract and Additions

19. Before the start of the conspiracy, a company later acquired by RAYTHEON and the six countries comprising the GCC, which included Qatar, entered into a contract to upgrade the GCC countries' air defense systems (the "GCC Contract"). In or around and between 2012 and 2013, the parties entered into four supplemental contracts to the GCC Contract called "additions," two of which pertained to Qatar alone (hereinafter, "First Qatar Addition" and "Second Qatar Addition"). Foreign Official 1 was the country leader for Qatar on the GCC Contract and Qatar's signatory on all four additions. Foreign Official 1 was instrumental in securing QEAF approval for the additions and helping RAYTHEON secure payments from the GCC on the additions.

20. In order to secure the additions and to obtain other improper advantages, RAYTHEON bribed Foreign Official 1 by entering into sham subcontracts with Qatari Company and Qatari Sub 2, purportedly for the provision of three air defense operations-related studies per contract. The studies were added to the First Qatar Addition and Second Qatar Addition scope of work at Foreign Official 1's direction. RAYTHEON paid Qatari Company and Qatari Sub 2 nearly $2 million for the studies despite knowing that the Qatari Entities did not perform any work on or incur any cost for the studies. Instead, Raytheon Employee 4 prepared the studies for Qatari Company and Qatari Sub 2 to pass off as their own. The payments to Qatari Company and Qatari Sub 2 for the studies were intended, in whole or in part, as bribes for the benefit of Foreign Official 1.

6

ii.   The JOC Contract

21.     RAYTHEON also offered an additional bribe to Foreign Official 1 in connection with its attempt to win a potential sole source contract from QAF to build the JOC (the "JOC Contract").

22.     In or around 2013, QAF established a committee to oversee the potential JOC project.   Foreign Official 1 was an advisor to the committee and had a close relationship with one of the Qatari officials leading the committee.   At around the same time, Foreign Official 1 became responsible for procurement and logistics at the QEAF, which allowed Foreign Official 1 to have more influence over the award of defense contracts, including the JOC Contract.

23.     In or around February 2016, RAYTHEON entered into a teaming agreement with Qatari Sub 2 in order to corruptly obtain Foreign Official 1's assistance with the JOC Contract, including obtaining Foreign Official 1's assistance in directly awarding the JOC Contract to RAYTHEON without a competitive bid.

24.     Pursuant to the teaming agreement, RAYTHEON agreed to subcontract a portion of the work associated with the JOC Contract to Qatari Sub 2.   RAYTHEON entered into the teaming agreement despite knowing that Qatari Sub 2 lacked sufficient capabilities to complete the work on the JOC Contract set forth in the agreement and with the intent that at least a portion of what would be paid to Qatari Sub 2 would be funneled as bribes to Foreign Official 1.

25.     Although the Qatari government ultimately did not go forward with the JOC Contract, RAYTHEON's anticipated revenue on the potential contract was approximately $510 million, and its anticipated profit was approximately $72.6 million.

B.    The First Qatar Addition

26.    On or about March 21, 2012, Raytheon Employee 5 traveled to Qatar to meet Foreign Official 1 in order to finalize the details on the First Qatar Addition.  During the meeting, Foreign Official 1 made an unusual, last-minute request to add defense studies to the First Qatar Addition scope of work.  After the meeting, Raytheon Employee 5 discussed Foreign Official 1's request with Raytheon Employee 1, who agreed to add the studies to the scope of work for the First Qatar Addition.

27.    On or about March 22, 2012, RAYTHEON added the studies to the scope of work, after which Foreign Official 1 signed the contract for the First Qatar Addition.

28.    On or about April 2, 2012, Raytheon Employee 5 used a personal email account to email Foreign Official 1: "[Raytheon Employee 1] tells me he went through the steps needed for us to work with a qualified company last time the two of you met in person.  You should contact [Raytheon Employee 1] directly to discuss."

29.    On or about April 5, 2012, Raytheon Employee 4 used a personal email account to send a draft contract to Foreign Official 1.  The attached contract provided that Local Company would prepare three studies for the benefit of RAYTHEON's customer, the QEAF, at a cost of approximately $850,000.  Raytheon Employee 4, as well as other RAYTHEON employees, knew that Local Company was affiliated with Foreign Official 1.  In the email, Raytheon Employee 4 wrote, "please see attached draft. Please copy it and past[e] it on the company template. You can say that it was prepared by a lawyer."

30.    Also, on or about April 5, 2012, Foreign Official 1 responded to Raytheon Employee 5's email referenced above in paragraph 28: "I would be happy to discuss the start of our work since our agreement together and you will find attached [d]raft agreement which [sic]

8

been done by my lawyer for you and [Employee 1] so we could beg[i]n our work." Foreign Official 1 attached the contract Raytheon Employee 4 sent to Foreign Official 1, on letterhead of Local Company, as instructed by Raytheon Employee 4.

31.    Once Qatari Company and Qatari Sub 1 were formed in or around May and July 2012, Foreign Official 1 introduced the newly-established entities to RAYTHEON. RAYTHEON then started to pursue a commercial relationship with Qatari Company and Qatari Sub 1 and stopped pursuing a relationship with Local Company.

32.    Raytheon Employee 3 helped Qatari Company and Qatari Sub 1 pass RAYTHEON's due diligence process—a prerequisite to receiving the sham studies subcontract—by coaching Individual 1 on what information to provide to RAYTHEON about the companies' leadership and capabilities.   With the knowledge of Raytheon Employee 3, Individual 1 submitted due diligence forms to RAYTHEON that falsely failed to disclose Foreign Official 1's involvement or ownership stake in Qatari Company and Qatari Sub 1 and overstated the companies' experience and capabilities.

33.    After Qatari Company and Qatari Sub 1 completed RAYTHEON's due diligence process in or around August 2013, Raytheon Employees 3 and 4 helped Qatari Company secure the subcontract for the studies, including by using personal email accounts to help draft its proposal to RAYTHEON and by assisting Qatari Company in its pricing negotiations with RAYTHEON.

34.    Raytheon Employee 4, with the knowledge of Raytheon Employees 1 and 3, prepared the studies and related outlines and reports, as required by the sham subcontract.   For example, on or about January 20, 2013, before the due diligence process was completed, Raytheon Employee 4 emailed Raytheon Employee 3 a document relating to the studies and wrote: "[Foreign

Official 1] explained that per [Foreign Official 1's] agreement with [Raytheon Employee 1], the first study should be done by Feb. . . . [Foreign Official 1] expects that I will complete the outlines for the three studies + the first study during my current visit (which I can). [Foreign Official 1] wants a confirmation from your side . . . ."

35. On or about October 7, 2013, Individual 1 sent an email to Raytheon Employee 4's personal email account attaching a draft commercial proposal for the studies and requesting help in finalizing the proposal.

36. On or about October 13, 2013, Raytheon Employee 4 emailed Individual 1 a revised proposal, in track changes mode, along with the message: "There are multiple comments for you to look at. This version can not be mailed to [RAYTHEON] as it includes my name. Please after you decide on the changes, please copy it to another 'new' document on your computer so that my name goes away[.] More security [sic] is to create a pdf file from the last version and mail the pdf file[.]"

37. On or about November 10, 2013, Raytheon Employee 3 used a personal email account to send a draft message to Individual 1, which was to be sent by Individual 1 to an employee in RAYTHEON's supply chain department to facilitate Qatari Company getting approved as a RAYTHEON contractor. Raytheon Employee 3 directed Individual 1 to "massage" the draft and send it back for review by Raytheon Employee 3 before submitting it to RAYTHEON. Included in Raytheon Employee 3's draft was the knowingly false assertion that Qatari Company would "utilize the expertise of 6-8 senior staff members over 6 months to complete this task [of completing each of the three studies]." In a follow-up email to Individual 1, Raytheon Employee 3 explained, "I set a range (6-8 heads) to intentionally make it difficult for [RAYTHEON supply chain] to determine a rate."

38.     In or around November 2013, before RAYTHEON signed a subcontract with Qatari Company, Raytheon Employee 4 traveled to Qatar and started preparing the studies, which Raytheon Employee 4 would later provide to Individual 1 so that Qatari Company could falsely claim that it performed the work required by the subcontract.

39.     On or about February 12, 2014, RAYTHEON issued a purchase order to Qatari Company in the amount of $975,000 for the three studies.

40.     Raytheon Employee 4 prepared the third and final study within a few months of RAYTHEON issuing the subcontract to Qatari Company.   Despite that fact, Individual 1 spaced out the status reports provided to RAYTHEON to make it appear as if Qatari Company performed the work required by the subcontract.  For example, on or about May 11, 2014, Individual 1 emailed Raytheon Employee 3 a status report stating that the first study was submitted to the QEAF and that a certificate verifying QEAF's approval was provided to RAYTHEON. Raytheon Employee 3 responded that "the status of study 2 and study 3 should also be included in this status report."  Individual 1 replied, "I need to wait for a couple of weeks before I send the status report about the second study since the first study was submitted on [April 20]."

41.     Meanwhile, Individual 1 submitted false paperwork to RAYTHEON certifying that Qatari Company had completed the work on the studies that were actually performed by Raytheon Employee 4.  Raytheon Employees 3 and 4 falsely certified that Qatari Company satisfied the requirements of its subcontract, such as providing the studies to Raytheon Employee 4 for review, to trigger payment from RAYTHEON to Qatari Company.  Also, in order to trigger payment, Qatari Company submitted paperwork to RAYTHEON certifying that Foreign Official 1, the purported ultimate customer of the studies, received the studies from Qatari Company and approved them in Foreign Official 1's capacity at the QEAF.

42. Between approximately May 28, 2014, and September 8, 2014, RAYTHEON made three payments totaling approximately $975,000 from its bank account in the United States to Qatari Company's bank account in Qatar, purportedly for the studies on the First Qatar Addition: (a) a transfer of approximately $536,250 on or about May 28, 2014; (b) a transfer of approximately $195,000 on or about August 5, 2014; and (c) a transfer of approximately $243,750 on or about September 8, 2014.

C.      The Second Qatar Addition

43. In or around 2013, as Foreign Official 1 gained more responsibilities within the QEAF, Foreign Official 1 began using an alias when communicating on behalf of the Qatari Entities and instructed Individual 1 to create an alias email account for Foreign Official 1 to use to communicate with RAYTHEON (the "Alias Email Account"). The Alias Email Account contained the Qatari Company's domain name and an alias for Foreign Official 1 belonging to a relative who shared Foreign Official 1's last name but was not known to be affiliated with the QEAF. Raytheon Employees 1-4 were aware of Foreign Official 1's use of the Alias Email Account.

44. Foreign Official 1 used the Alias Email Account to communicate with other RAYTHEON personnel in order to secure a subcontract from RAYTHEON for Qatari Sub 2 for the studies on the Second Qatar Addition.

45. Raytheon Employee 4, with the knowledge of other RAYTHEON employees, including Raytheon Employee 3, prepared and provided the studies and related documents to Foreign Official 1 so that Qatari Sub 2 could falsely claim that it performed the work required by the subcontract and get paid by RAYTHEON.

46.     As with the studies on the First Qatar Addition, Foreign Official 1, acting on behalf of the QEAF, requested that studies be added to the Second Qatar Addition at the last-minute, while negotiating the signing of the Second Qatar Addition. Specifically, on or about March 26, 2013, Raytheon Employee 4 emailed a group of RAYTHEON employees, including Raytheon Employee 3, that "the customer," referencing Foreign Official 1, requested that three studies on air operations be added to the statement of work and performed by RAYTHEON's program management office. Raytheon Employee 4 attached a signed, modified statement of work for the Second Qatar Addition requiring RAYTHEON to provide QEAF with three specified studies during the execution of the Second Qatar Addition.

47.     On or about and between April 10, 2013, and April 18, 2013, GCC made five payments to RAYTHEON totaling approximately $15.4 million in connection with the additions: (a) a transfer of approximately $2,549,848 on or about April 10, 2013; (b) a transfer of approximately $5,099,669 on or about April 16, 2013; (c) a transfer of approximately $1,906,954 on or about April 16, 2013; (d) a transfer of approximately $1,906,955 on or about April 16, 2013; and (e) a transfer of approximately $3,998,827 on or about April 18, 2013.

48.     On or about April 22, 2013, Raytheon Employee 4 wrote to Raytheon Employees 1 and 3 that Foreign Official 1 "was the main element behind . . . the payment release."

49.     On or about October 16, 2015, RAYTHEON issued a request for a price quotation to Qatari Sub 2 for the three studies for the Second Qatar Addition, to which Qatari Sub 2 provided a response.

50.     As with the First Qatar Addition, Raytheon Employee 4 coached Qatari Sub 2 on the proposal it submitted to RAYTHEON, while Raytheon Employee 3 helped Qatari Sub 2 pass RAYTHEON's due diligence process in order to receive the subcontract for the studies.

51. For example, on or about February 11, 2015, Raytheon Employee 3 used a personal email account to send Foreign Official 1 an email attaching RAYTHEON's due diligence questionnaire directed to Qatari Sub 2, and writing "my ideas in red text." The attached questionnaire included Raytheon Employee 3's suggested responses for Qatari Sub 2 to provide to RAYTHEON, many of which were inaccurate.

52. As another example, on or about June 13, 2015, Raytheon Employee 4 used a personal email account to send an email to Foreign Official 1, writing "please see the attached modified 'old' SOW [Statement of Work]. I added the justification page." Raytheon Employee 4 attached Qatari Company's proposal document for the studies on the First Qatar Addition, along with suggested edits modifying the proposal for the Second Qatar Addition.

53. On or about October 28, 2015, Raytheon Employee 4 used a personal email account to email Foreign Official 1 a draft proposal for Qatari Sub 2 to submit to RAYTHEON.

54. On or about November 4, 2015, Foreign Official 1, utilizing the Alias Email Account, sent an email to RAYTHEON's supply chain with Qatari Sub 2's proposal for the studies. The proposal largely tracked the language of the draft sent to Foreign Official 1 by Raytheon Employee 4, described above in paragraph 53, and was signed in the name of Foreign Official 1's alias, with the title of "Member, Board of Directors."

55. On or about March 25, 2016, RAYTHEON issued a purchase order to Qatari Sub 2 in the amount of $950,000 for the three studies that were part of the Second Qatar Addition. The purchase order was sent to Foreign Official 1 at the Alias Email Account.

56. Raytheon Employee 4 traveled to Qatar on or about and between March 25, 2016, and April 8, 2016. During this time, on or about March 30, 2016, Raytheon Employee 4 used a personal email account to send Foreign Official 1 outlines of the studies and a start-up

report, which contained false representations that Qatari Sub 2 performed certain activities to begin work on the studies, directing Foreign Official 1 to print the documents "on company papers, get signatures from the right person, and mail them."

57.    As directed by Raytheon Employee 4, on or about April 23, 2016, Foreign Official 1 submitted the start-up report on Qatari Sub 2's letterhead and signed in the name of Foreign Official 1's alias, as board member of Qatari Sub 2.

58.    On or about August 30, 2016, after Foreign Official 1 retired from the QEAF, Foreign Official 1, using the Alias Email Account, emailed RAYTHEON's supply chain two invoices from Qatari Sub 2, along with a form showing approval of the first study by the customer, Foreign Official 1, on behalf of QEAF.   Qatari Sub 2's documents were signed in the name of Foreign Official 1's alias, as board member of Qatari Sub 2.

59.    On or about March 15, 2017, Raytheon Employee 2 used a personal email account to email Foreign Official 1, requesting confirmation that Qatari Sub 2 had completed the second and third studies.   Raytheon Employee 2 reported to Foreign Official 1 that "[w]e have not received their 3rd invoice which is for the second study. Can you please contact me tomorrow to discuss."   Foreign Official 1 responded, "I am outside Doha[.]   The invoice will be sent to you next week and we are in the process of printing the third study.   I am following all these issues now."

60.    Between approximately January 25, 2017, and November 14, 2017, RAYTHEON made three payments totaling approximately $950,000 from its bank account in the United States to Qatari Sub 2's bank account in Qatar, purportedly for the studies, including: (a) a transfer of approximately $475,000 on or about January 25, 2017; (b) a transfer of approximately

$237,500 on or about October 3, 2017; and (c) a transfer of approximately $237,500 on or about November 14, 2017.

        D.    <u>The JOC Contract</u>

        61.    In or around 2013, RAYTHEON pursued a partnership with Qatari Sub 1 on the JOC Contract in order to corruptly influence Foreign Official 1 to improperly assist RAYTHEON, including by having the QEAF sole source the JOC Contract to RAYTHEON so that it did not need to engage in a competitive bid. At around this time, Foreign Official 1 assumed responsibility over procurement and logistics at the QEAF and had influence over the committee responsible for the JOC project.

        62.    On or about September 21, 2013, Raytheon Employee 1 emailed their supervisor and several other RAYTHEON employees and executives about a meeting with Foreign Official 1. Raytheon Employee 1 had met with Foreign Official 1 in both Foreign Official 1's official capacity on behalf of the QEAF and in a commercial capacity as a representative of the Qatari Entities. Raytheon Employee 1 wrote in the email that, in their role as a decision-maker at the QEAF, Foreign Official 1 submitted a report in favor of proceeding with another contract that was worth billions of dollars to RAYTHEON. Raytheon Employee 1 also wrote, "Relative to [Qatari Sub 1] they are thinking things over and are strongly considering going with [a competitor of RAYTHEON]. They have been in discussions with [the competitor] for many months. If they do, then the POA [Probability of Award] for the JOC has just dropped dramatically."

        63.    In or around June 2014, the QAF selected Qatari Sub 1 as a consultant to the committee in charge of the JOC Contract. As a consultant on the project, Qatari Sub 1 would help draft requests for proposals and advise the Qatari government on which company should be awarded the JOC Contract.

16

64.     On or about March 2, 2015, Raytheon Employee 2 and another RAYTHEON employee prepared a presentation slide deck on the JOC project, which included Qatari Sub 1, Qatari Sub 2 and Foreign Official 1 as among the "decision-makers" on the contract.

65.     After Qatari Sub 1 started advising the QAF on the JOC project, RAYTHEON, through Raytheon Employee 2 and others, pursued a teaming agreement with Qatari Sub 2 for the JOC Contract. In a summary document on the JOC Contract drafted on or about March 16, 2015, Raytheon Employee 2 described Qatari Sub 2 as a "local Qatari company (part of [Qatari Entities]) and a partnership with them will be key to an award."

66.     In or around May 2015, soon after Qatari Sub 1's contract with the QAF became effective, Foreign Official 1 and Raytheon Employee 4 convinced the Qatari government committee overseeing the JOC project to visit RAYTHEON's offices in California, together with representatives of Qatari Sub 1, and meet with RAYTHEON personnel in order to discuss and influence the committee's request for proposal documents in RAYTHEON's favor. The meetings were described in internal RAYTHEON presentations as "greatly improv[ing] [RAYTHEON's probability of winning] with sole source possibility."

67.     Raytheon Employee 2 negotiated the teaming agreement with Foreign Official 1 and Individual 1 as representatives of Qatari Sub 2.

68.     On or about October 13, 2015, during the teaming agreement negotiations, Individual 1 sent an email to Foreign Official 1 and another shareholder/board member of the Qatari Entities with a draft portion of the teaming agreement and wrote, "[i]deally, shareholders should stop making the effort to support a sole source contract award to RAYTHEON until the teaming agreement is signed."

69.     On or about February 5, 2016, Qatari Sub 2 and RAYTHEON signed the teaming agreement for the JOC Contract, despite certain RAYTHEON executives raising concerns regarding Qatari Sub 2's lack of abilities and its relationship with Foreign Official 1.   The teaming agreement provided that RAYTHEON would submit a proposal to the QAF on the JOC Contract and would offer a subcontract to Qatari Sub 2 for a portion of the awarded work.

70.     In or around 2017, Qatar's Ministry of Defense cancelled the JOC project for unrelated reasons.   Therefore, Qatari Sub 2 never received any payments from RAYTHEON under the teaming agreement.

* * * *

71.     As a result of the bribe scheme, RAYTHEON earned approximately $36.7 million in profits from the four additions to the GCC Contract described above, and expected to earn over $72 million more, had the JOC Contract come to fruition.

IV.     The ITAR Part 130 Conspiracy

A.     Overview of the ITAR Part 130 Scheme

72.     Between in or around 2012 and in or around 2016, RAYTHEON, through certain of its employees and agents, knowingly and willfully conspired and agreed with others to violate the AECA and ITAR Part 130 by failing to disclose to DDTC fees and commissions paid in connection with the First Qatar Addition and Second Qatar Addition – specifically, the bribes RAYTHEON paid to Foreign Official 1 through its sham subcontracts with the Qatari Entities.

73.     The First Qatar Addition and Second Qatar Addition involved the transfer of defense articles and defense services by RAYTHEON to QEAF.   Accordingly, RAYTHEON required a license from DDTC to fulfill these contracts.   To obtain a license for both additions, RAYTHEON submitted an application to DDTC in or around May 2013 (the "License

Application"). Because the First and Second Qatar Additions were valued in the millions of dollars, RAYTHEON was also obligated under ITAR Part 130 to report any anticipated commissions or fees paid in connection with the additions on the License Application. 22 C.F.R. § 130.9. Despite that obligation, however, RAYTHEON falsely certified that it had no such payments to report, and DDTC approved the License Application in or around July 2013. The license authorizing the First and Second Qatar Additions (the "License") remained in effect until in or around October 2023. At no point during that period did RAYTHEON disclose to DDTC the bribes paid to Foreign Official 1, despite its ongoing obligation to correct the false certification on the License Application. 22 C.F.R. § 130.11.

74. As explained, Raytheon Employees 1-4 knew about and furthered the Qatar bribery scheme connected to these First and Second Qatar Additions. They also understood export laws and regulations, including the Company's obligations under ITAR Part 130. Further, they were aware that the First Qatar Addition and Second Qatar Addition were subject to the ITAR, and that the Company had an obligation to disclose any reportable payments under Part 130 related to those additions. In continuing to conceal the bribery scheme during all stages of the DDTC licensing and compliance process, however, Raytheon Employees 1-4 willfully caused both the submission of the License Application's false Part 130 certification and RAYTHEON's subsequent failure to correct it.

B.  Knowledge of ITAR Part 130 Obligations

75. During the relevant period, Raytheon Employees 1-4 were familiar with ITAR Part 130's requirements regulating the disclosure of political contributions, fees and commissions paid in connection with the sales of defense articles and services.

76. Between in or around 2008 and 2018, Raytheon Employees 1-4 received regular training on anti-corruption, export control and sanctions laws, including ITAR Part 130. Raytheon Employees 1-4, for example, each took an annual training course on "Complying with U.S. Export Controls" between 2008 and 2015 as well as several additional refresher courses on export controls. Each of these employees also completed more specialized courses on ITAR requirements and recognizing export-controlled technical information. In or around 2016, moreover, Raytheon Employees 1-4 each completed at least three training courses devoted to compliance with Part 130.

77. Beginning no later than in or around January 2012, moreover, Raytheon Employees 1-4 also received additional reminders about the Company's export obligations, including Part 130 reporting requirements.

78. On or about January 31, 2012, Raytheon Employee 1 forwarded an email chain from RAYTHEON export compliance personnel to several RAYTHEON employees, including Raytheon Employees 2-4. The forwarded email was marked with "High" importance and advised the recipients about an upcoming audit of RAYTHEON's export compliance. The email cautioned, "Please make sure you and yours are familiar with export requirements in general." The first item listed on the agenda for the audit was "Part 130 Compliance (reporting political contributions, fees, and commissions involving foreign sales of defense articles/services." The forwarded email also included links to the Company's export controls policies and procedures.

79. On or about December 2, 2013, Raytheon Employee 1 forwarded an email from RAYTHEON export compliance personnel to several RAYTHEON employees, including Raytheon Employees 2-4. The forwarded email discussed an April 2013 Consent Agreement RAYTHEON entered into with DDTC "after an extensive enforcement review found there was a

'corporate-wide weakness' in administering export licenses and agreements." The forwarded email also advised all employees that "you have a responsibility to know and understand your program's export authorizations and proactively manage them."

80.     On or about May 19, 2014, RAYTHEON export compliance personnel sent an email to several RAYTHEON employees, including Raytheon Employees 1-4. The email advised the recipients, "[p]lease note the below Corporate policies affecting international business and global trade compliance were recently updated." The updated policies listed in the email included RAYTHEON's policy governing ITAR Part 130 Compliance ("Raytheon's Part 130 Policy"). The email also explained that "the policy establishes controls to assure compliance with U.S. laws and regulations, in particular 22 CFR Part 130."

81.     On or about February 26, 2015, RAYTHEON export compliance personnel sent an email with the subject line, "Additional Part 130 Training – Live Training Requirement," to several RAYTHEON employees, including Raytheon Employees 1-4. The email stated, "[i]n order to provide guidance and further education regarding Part 130 of the ITAR, Corporate has requested that we provide additional live training to the team here" and that it was "important that [recipients] make every effort to attend this live training session, no sametime." An earlier email in the same chain explained, "[a]s an important anti-corruption monitoring mechanism, we are required by ITAR Part 130 to report compensation paid to third parties who assist in soliciting, promoting or otherwise [] in securing the sale of defense articles and/or defense services to or for the use of the armed forces of a foreign country." The email further noted that "Raytheon's policy for reporting and responsibilities is set forth in [Raytheon's Part 130 Policy]. We each play an important part in adherence with this requirement." The email included links to the training material as well as additional training and resources on Part 130 compliance.

82.     On or about March 25, 2015, RAYTHEON export compliance personnel sent an email to several RAYTHEON employees, including Raytheon Employees 1-4.   The email advised of updates to Raytheon's Part 130 Policy and included a chart summarizing the updates.

83.     On or about May 12, 2015, Raytheon Employee 1 sent an email to several RAYTHEON employees, including Raytheon Employees 2-4, containing the subject line "Compliance with [Raytheon's Part 130 Policy]."   Raytheon Employee 1 wrote, in part, "[I]t is very important that we improve our awareness and acknowledge our [project management] roles and responsibilities relative to [Raytheon's Part 130 Policy].   We have a responsibility to comply with the requirements of this policy and ensure that our staff(s) have an understanding of the policy and what it means to our business."   The email also explained that RAYTHEON's program managers, which included Raytheon Employees 1-4, were "responsible for implementing processes to identify and report payments or agreements to pay" subject to Part 130 disclosure requirements.   The email directed all recipients to read and acknowledge their understanding of Raytheon's Part 130 Policy.

84.     On or about September 20, 2016, RAYTHEON export compliance personnel sent an email to Raytheon Employees 1 and 2 with an invitation to attend an "IDS Part 130 Face to Face" training.   The email explained, "Export/Import excellence is critical to IDS business growth.   Part 130 compliance is essential to that, and as a business we need to continue to focus in this area."   The email also noted that the training would include the "Background/History of Part 130 Requirements" and an overview of RAYTHEON's policies in the area.

C.    Concealment of the Bribes in the Part 130 Reporting Process

    i.    RAYTHEON's Part 130 Reporting Process

85.    During the relevant period, RAYTHEON employed various procedures for compliance with Part 130 reporting. These procedures relied on employee disclosure of any known reportable payments to compliance personnel.

86.    First, as noted above, prior to RAYTHEON's onboarding of any third party as a subcontractor, RAYTHEON conducted a due diligence process that required employee and third party input. This due diligence process was the predominant way in which the Company vetted subcontractors to identify potential anticorruption risks, including the risk that a subcontractor may pay bribes that also would implicate ITAR Part 130 reporting requirements.

87.    Second, in conjunction with the submission of a license application to DDTC, export compliance officials required employees involved in the underlying contract to review the license application for accuracy and identify Part 130 reportable payments.

88.    Third, after a contract subject to the ITAR was signed, RAYTHEON's Part 130 Policy required either contract management personnel or, beginning in or around April 2014, program management personnel to collect information about potentially reportable payments for disclosure to DDTC. Because, as noted, ITAR Part 130 also requires Applicants for defense contract licenses to disclose commissions, fees, or political contributions made by any Vendors or subcontractors on a defense contract, 22 C.F.R. §§ 130.8, 130.9, RAYTHEON's Part 130 Policy further required RAYTHEON employees to obtain an "IN-009" from subcontractors. That form required subcontractors to disclose whether they had paid any commissions, fees or political contributions to another third party in connection with the subcontract.

89.     Fourth, following the approval of a license application by DDTC, RAYTHEON export compliance personnel implemented a "Program Export/Import Control Plan" ("PEICP") for the approved license. The PEICP provided key stakeholders on the contract, including program managers, contract managers, technical directors, and engineers, with a compliance briefing on all conditions of the export authorization, including ongoing Part 130 reporting obligations.

ii.     Employees' Willful Failure to Disclose the Bribes

90.     In all stages of RAYTHEON's export compliance process, RAYTHEON employees had an obligation to identify any potential violations of export laws and regulations, including any potential payments that should be disclosed under ITAR Part 130. Nevertheless, and despite their awareness of Part 130's reporting requirements, Raytheon Employees 1-4 concealed the bribery scheme during this process.

91.     RAYTHEON's due diligence process provided the first mechanism for the Company to screen for the risk of potential corrupt payments to third party subcontractors that would also be reportable under Part 130. Between in or around 2012 and 2015, RAYTHEON employees, including Raytheon Employee 3, not only evaded that process to assist the Qatari Entities with passing RAYTHEON's due diligence, including as described above in paragraphs 32 and 50-51, but they also failed to disclose the bribes paid in connection with the First and Second Qatar Additions as required under Part 130.

92.     RAYTHEON employees also concealed the bribe payments at several other stages of the Part 130 reporting and compliance process for the First and Second Qatar Additions.

93.     Between in or around January 2013 and May 2013, Raytheon Employees 1, 3, and 4 corresponded with export compliance personnel about applying for the License that would

encompass both additions. During the same period, RAYTHEON's export compliance personnel solicited information about the additions, including any potentially reportable Part 130 payments, from key stakeholders in the contracts, including Raytheon Employees 1, 3, and 4. RAYTHEON's export compliance personnel also circulated a draft license application with a Part 130 certification to key stakeholders, including Raytheon Employees 3 and 4. At no point during their involvement in the preparation of the License Application did Raytheon Employees 1, 3, or 4 disclose the anticipated bribes to the Foreign Official 1.

94. On or about May 29, 2013, a RAYTHEON empowered official, as defined in 22 C.F.R. § 120.25, submitted the License Application for the First Qatar Addition and Second Qatar Addition, based in part on the input of Raytheon Employees 1, 3, and 4. Unbeknownst to the empowered official, the License Application contained the following false certification of compliance with Part 130: "This transaction meets the requirements of 22 C.F.R. 130.2. The applicant or its vendors have not paid, nor offered, nor agreed to pay, in respect of any sale for which a license or approval is requested, political contributions, fees or commissions in amounts specified in 22 CFR 130.9(a)."

95. In or around June 2013, pursuant to Raytheon's Part 130 Policy, the contracts manager for the First Qatar Addition emailed several RAYTHEON employees soliciting information about payments that must be disclosed under Part 130. The email attached forms containing explicit references to RAYTHEON's obligation to report fees, commissions, or political contributions paid to third parties in connection with defense contracts as well as Raytheon's Part 130 Policy. Raytheon Employee 3 was copied. He did not, however, disclose the intended bribe payments to Foreign Official 1 with respect to either the First or Second Qatar Additions.

96.     On or about July 8, 2013, DDTC approved with provisos the License Application for the First and Second Qatar Additions. A few days later, RAYTHEON's empowered official sent the approved application to the contract additions' key stakeholders, including Raytheon Employees 3 and 4. The empowered official requested that they acknowledge, understand, and accept the approval and provisos. Both Raytheon Employees 3 and 4 did so without disclosing intended bribe payments to Foreign Official 1.

97.     On or about September 12, 2013, Raytheon Employee 3 signed an internal RAYTHEON form that documented certain fees or commission payments tied to the First Qatar Addition. The form identified an unrelated Qatar country representative as the recipient of fees or commissions, but not Foreign Official 1.

98.     In or around February 2014, the First Qatar Addition's contract manager corresponded with RAYTHEON export compliance personnel concerning whether there were any fees, commissions or political contributions that were reportable under Part 130 for the First and Second Qatar Additions. Relying on input from other RAYTHEON employees, including Raytheon Employees 3 and 4, the contract manager affirmed that, to the best of his knowledge, there were no such fees, commissions or contributions to report.

99.     On or about May 1, 2014, Raytheon Employees 3 and 4 received a PEICP plan for the License. They were instructed to "[r]eview the enclosed briefing in its entirety." Among other provisions, the PEICP briefing:

(a)     directed the "Agreement Owner," identified as Raytheon Employee 3, to "make this PEICP available to each member of the team (stakeholders) and ensure all team members have a complete understanding of the scope, limitations and provisos, and PEICP requirements";

(b)    affirmed that the License "meets Part 130 [requirements]," but further stated, falsely, "that no commissions/fees [were] offered/paid";

(c)    made clear that "[a]ll personnel are responsible for ensuring compliance under the export authorization, and reporting any potential non-compliance to Ex/Im Ops or the Legal Department immediately"; and

(d)    warned that "[v]iolations of export control laws can result in business fines and penalties, possible loss of export privileges, . . . any/or employee termination and imprisonment. Any employee who has reason to believe that an export violation has occurred, or may occur . . . must promptly report this information to Export/Import Operations, Legal or the Ethics Office."

100.    On or about May 14, 2014, Raytheon Employees 3 and 4 signed the PEICP Briefing without disclosing the intended bribes to Foreign Official 1.

101.    In or around February and March 2016, pursuant to its Part 130 Policy, RAYTHEON made efforts to obtain a signed IN-009 form from Qatari Sub 2 before finalizing the subcontract for the sham studies. On or about February 17, 2016, a RAYTHEON employee reported to Raytheon Employees 1 and 2 that he had asked Qatari Sub 2 to submit "the FCPA document (IN-009) and the Ts and Cs."

102.    On or about March 1, 2016, a RAYTHEON employee again asked Qatari Sub 2 to return a signed IN-009 form, among other requests, but did not receive a response. RAYTHEON employees then corresponded internally about the lack of response, with one employee noting, "[Qatari Sub 2] must sign and return IN-009, International Traffic in Arms Regulations (ITAR) Certificate—Reporting of Political Contributions, Fees or Commissions (ITAR Part 130)." This correspondence was forwarded to Raytheon Employee 2, who was asked

to "make a call to these guys" to "ask them to respond!" Raytheon Employee 2 confirmed that they would call Qatari Sub 2 directly. A few days later, RAYTHEON received a signed IN-009 form. Qatari Sub 2 falsely certified that it had not "directly or indirectly paid, or offered or agreed to pay political contributions, fees or commissions" with respect to the subcontract, when in fact, as noted, the money it would receive was to be funneled, in whole or in part, to Foreign Official 1. At no point while facilitating the submission of the false IN-009 form did Raytheon Employee 2 disclose the intended bribes to Foreign Official 1 as reportable Part 130 payments.

\* \* \* \*

103. As a result of the ITAR Part 130 scheme, RAYTHEON earned approximately $13,690,531.20 in profits from the First and Second Qatar Additions.

### COUNT ONE
(Conspiracy to Violate the FCPA)

104. The allegations contained in paragraphs 1 and 5 through 71 are realleged and incorporated as if fully set forth in this paragraph.

105. In or about and between 2012 and 2016, both dates being approximate and inclusive, in the United States and elsewhere, the defendant RAYTHEON, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit: being an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given, and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof

28

in his, her and its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her and its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist RAYTHEON in obtaining and retaining business for and with, and directing business to, RAYTHEON and others, contrary to Title 15, United States Code, Section 78dd-1.

106. In furtherance of the conspiracy and to effect its objects, in the United States and elsewhere, the defendant RAYTHEON, together with others, committed, and caused the commission of, among others, at least one of the following:

OVERT ACTS

(a) On or about March 22, 2012, RAYTHEON added defense studies to the scope of work for the First Qatar Addition.

(b) On or about January 20, 2013, Raytheon Employee 4 emailed Raytheon Employee 3 a document relating to the studies for the First Qatar Addition and wrote: "[Foreign Official 1] explained that per [Foreign Official 1's] agreement with [Raytheon Employee 1], the first study should be done by Feb. . . . [Foreign Official 1] expects that I will complete the outlines for the three studies + the first study during my current visit (which I can). [Foreign Official 1] wants a confirmation from your side . . . ."

(c) On or about March 26, 2013, Raytheon Employee 4 emailed a group of RAYTHEON employees, including Raytheon Employee 3, that "the customer," referencing Foreign Official 1, requested that three studies on air operations be added to the statement of work

and performed by RAYTHEON's program management office. Raytheon Employee 4 attached a signed, modified statement of work for the Second Qatar Addition requiring RAYTHEON to provide QEAF with three specified studies during the execution of the Second Qatar Addition.

(d)     On or about February 12, 2014, RAYTHEON issued a purchase order to Qatari Company in the amount of $975,000 for the three studies that were part of the First Qatar Addition.

(e)     On or about May 28, 2014, RAYTHEON transferred approximately $536,250 from its bank account in the United States to Qatari Company's bank account in Qatar.

(f)     On or about August 5, 2014, RAYTHEON transferred approximately $195,000 from its bank account in the United States to Qatari Company's bank account in Qatar.

(g)     On or about September 8, 2014, RAYTHEON transferred approximately $243,750 from its bank account in the United States to Qatari Company's bank account in Qatar.

(h)     On or about October 28, 2015, Raytheon Employee 4 used a personal email account to email Foreign Official 1 a draft proposal for Qatari Sub 2 to submit to RAYTHEON.

(i)     On or about February 5, 2016, Qatari Sub 2 and RAYTHEON signed a teaming agreement for the JOC Contract.

(j)     On or about March 25, 2016, RAYTHEON issued a purchase order to Qatari Sub 2 in the amount of $950,000 for the three studies that were part of the Second Qatar Addition. The purchase order was sent to Foreign Official 1 at the Alias Email Account.

(k)  On or about March 30, 2016, Raytheon Employee 4 used a personal email account to send Foreign Official 1 outlines of the studies and a start-up report for the Second Qatar Addition.

(l)  On or about January 25, 2017, RAYTHEON transferred approximately $475,000 from its bank account in the United States to Qatari Sub 2's bank account in Qatar.

(m)  On or about October 3, 2017, RAYTHEON transferred approximately $237,500 from its bank account in the United States to Qatari Sub 2's bank account in Qatar.

(n)  On or about November 14, 2017, RAYTHEON transferred approximately $237,500 from its bank account in the United States to Qatari Sub 2's bank account in Qatar.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Violate the AECA)

107.  The allegations contained in paragraphs 2 through 103 are realleged and incorporated as if fully set forth in this paragraph.

108.  In or about and between 2012 and 2016, both dates being approximate and inclusive, in the United States and elsewhere, the defendant RAYTHEON, together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit: to violate the Arms Export Control Act ("AECA"), 22 U.S.C. Sections 2778 and 2779, and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Part 130, by failing to furnish information and supplement prior information furnished to the Directorate of Defense Trade Controls as an Applicant as defined in 22 C.F.R. § 130.2,

31

regarding payment, or offer or agreement of payment, of fees or commissions in an aggregate amount of $100,000 or more in respect of any sale for which a license or approval is requested, contrary to Title 22, United States Code, Sections 2778 and 2779.

109.     In furtherance of the conspiracy and to effect its objects, in the United States and elsewhere, the defendant RAYTHEON, together with others, committed, and caused the commission of, among others, at least one of the following:

OVERT ACTS

(a)     On or about March 22, 2012, RAYTHEON added three studies to the scope of work for the First Qatar Addition.

(b)     On or about March 26, 2013, Raytheon Employee 4 emailed a group of RAYTHEON employees, including Raytheon Employee 3, that "the customer," referencing Foreign Official 1, requested that three studies on air operations be added to the statement of work and performed by RAYTHEON's program management office.   Raytheon Employee 4 attached a signed, modified statement of work for the Second Qatar Addition requiring RAYTHEON to provide QEAF with three specified studies during the execution of the Second Qatar Addition.

(c)     On or about May 29, 2013, RAYTHEON submitted an application to DDTC for a license to transfer defense articles and defense services valued in an amount greater than $500,000 by RAYTHEON to QEAF under the First and Second Qatar Additions.   In that application, RAYTHEON certified that it had no commissions or fees paid or offered or agreed to pay in connection with the additions on the License Application to report.

(d)     On or about July 9, 2013, in response to a request by Raytheon's empowered official that they acknowledge, understand, and accept DDTC's July 8, 2013 approval

of the License Application and provisos, both Raytheon Employees 3 and 4 did so without disclosing the intended bribe payments to Foreign Official 1.

(e)      On or about February 12, 2014, RAYTHEON issued a purchase order to Qatari Company in the amount of $975,000 for the three studies.

(f)      On or about May 1, 2014, Raytheon Employees 3 and 4 received a PEICP plan for the License. They were instructed to "[r]eview the enclosed briefing in its entirety," including a provision affirming that the License "meets Part 130 [requirements]," but further stating, falsely, "that no commissions/fees [were] offered/paid."

(g)      On or about May 14, 2014, Raytheon Employees 3 and 4 signed the PEICP Briefing without disclosing the intended bribes to Foreign Official 1.

(h)      Between on or about May 28, 2014, and September 8, 2014, RAYTHEON transferred approximately $975,000 from its bank account in the United States to Qatari Company's bank account in Qatar.

(i)      On or about February 17, 2016, a RAYTHEON employee reported to Raytheon Employees 1 and 2 that they had asked Qatari Sub 2 to submit "the FCPA document (IN-009) and the Ts and Cs."

(j)      On or about March 1, 2016, a RAYTHEON employee again asked Qatari Sub 2 to return a signed IN-009 form, among other requests, but did not receive a response. RAYTHEON employees then corresponded internally about the lack of response. This correspondence was forwarded to Raytheon Employee 2, who was asked to "make a call to these guys" to "ask them to respond!" Raytheon Employee 2 confirmed that they would call Qatari Sub 2 directly.

(k)     On or about March 14, Qatari Sub 2 submitted a signed IN-009 form to RAYTHEON.   In the form, Qatari Sub 2 falsely certified that it had not "directly or indirectly paid, or offered or agreed to pay political contributions, fees or commissions" with respect to the subcontract.   At no point while facilitating the submission of the false IN-009 form did Raytheon Employee 2 disclose the intended bribes to Foreign Official 1 as reportable Part 130 payments.

(l)     On or about March 25, 2016, RAYTHEON issued a purchase order to Qatari Sub 2 in the amount of $950,000 for the three studies that were part of the Second Qatar Addition.

(m)     Between on or about January 25, 2017, and November 14, 2017, RAYTHEON transferred approximately $950,000 from its bank account in the United States to Qatari Sub 2's bank account in Qatar.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

110.    The United States hereby gives notice to the defendant that, upon its conviction of either of the offenses charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

111.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

34

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

*Breon Peace*

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*Jennifer Kennedy Gellie / LCC*

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export Control
Section
National Security Division
U.S. Department of Justice